**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MICHAEL D. LARROWE, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | **AND RECOMMENDATION** |
| v. | ) | |
| | ) | 1:10CV378 |
| BANK OF THE CAROLINAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions: a motion for summary judgment as to the complaint by Defendant Bank of the Carolinas (docket no. 108); a motion for summary judgment by Defendants William A. Burnette and Thomas G. Fleming (docket no. 111); a motion for summary judgment by Defendant Robert W. Johnson (docket no. 114); a motion for summary judgment by Defendant James Timothy Merritt (docket no. 117); a motion for summary judgment by Defendant Bank of the Carolinas on its amended counterclaims against Plaintiff Michael Larrowe (docket no. 130); and a motion for summary judgment by Plaintiff Michael Larrowe as to Defendant Bank of the Carolinas' amended counterclaims (docket no. 119).[1] The parties have responded in opposition to the respective motions, and the matter is ripe for disposition. Furthermore, the parties have not consented to the

_____

[1] Defendants Michele Clodfelter and Denise Barnhardt had also filed motions for summary judgment, but the parties have entered into a stipulation of dismissal as to these defendants. (*See* docket entry dated April 28, 2011.)

jurisdiction of the magistrate judge; therefore, the motions must be dealt with by way of recommendation.

For the following reasons, it will be recommended that the court grant the following motions: the motion for summary judgment by Defendant Bank of the Carolinas (docket no. 108); the motion for summary judgment by Defendants William A. Burnette and Thomas G. Fleming (docket no. 111); the motion for summary judgment by Defendant Robert W. Johnson (docket no. 114); the motion for summary judgment by Defendant James Timothy Merritt (docket no. 117); and the motion for summary judgment by Plaintiff Michael Larrowe as to Defendant Bank of the Carolinas' amended counterclaims (docket no. 119).

Furthermore it will be recommended that the court deny the following motion: the motion for summary judgment by Defendant Bank of the Carolinas on its amended counterclaims against Plaintiff Michael Larrowe (docket no. 130).

## I.    Background

Plaintiff, a former officer and Director of the Bank of the Carolinas, filed this lawsuit against the Bank and six individuals after the Bank terminated Plaintiff's employment.  Plaintiff has not brought a breach of contract action under his employment agreement with the Bank.  Rather, Plaintiff alleges various tort claims against Defendants.  As to Defendant Bank, Plaintiff brings claims of negligence in the retention and supervision of another officer of the Bank, Robert W. Johnson, and

two fellow Directors, Bill Burnette and Tommy Fleming.  Plaintiff has also asserted direct and vicarious liability of the Bank for purported defamation by Johnson.

## II.  Facts[2]

Plaintiff Michael Larrowe is a founding Director of Defendant Bank of the Carolinas.  (Compl. ¶ 12.)  On May 12, 2008, Plaintiff became Executive Vice Chairman and Chief Operating Officer of the Bank pursuant to an Employment Agreement dated August 4, 2008, which was amended and restated on December 23, 2008.  (*Id.* ¶ 13.)  Plaintiff's employment agreement had a three-year rolling term, which meant that another year was to be added annually, unless either party provided notice that it would not be renewed for that additional year.  (*Id.* ¶ 14.)  In such an event, Plaintiff's contract would terminate at the conclusion of the then-current term.  (*Id.*)

In October 2009, the Bank received an anonymous complaint ("the Anonymous Complaint") alleging that Plaintiff and another Bank employee had

---

[2]  In conjunction with the summary judgment motions, both parties have filed hundreds of pages of briefs with a multitude of exhibits.  Furthermore, in their briefs, the parties have both presented numerous facts that are either not materially disputed facts, or are simply not relevant to the claims asserted.  For this reason, the court is not going to recite in its own statement of facts all of the facts presented by the parties–"facts" that are in reality merely innuendos, anecdotes, rhetoric, and salacious narratives that contribute nothing to the parties' legal arguments.  The court is disappointed by the nastiness and downright unprofessional manner in which both parties have presented their arguments.  Finally, as is always the case on a motion for summary judgment, the court will focus only on material facts that are in dispute; and the court will draw all inferences in favor of the non-moving party as to each motion.

committed possible violations of the Sarbanes-Oxley Act of 2002.[3] (*See id.* ¶ 35.) More specifically, according to Plaintiff, the Anonymous Complaint made the following false allegations: (1) that Plaintiff had inappropriately asked the Bank's internal auditor to perform tasks; (2) that Plaintiff had asked the internal auditor to fabricate reports to Examiners of the North Carolina Office of Commission of Banks ("OCOB"); (3) that Plaintiff had told Bank employees not to speak to OCOB Examiners; and (4) that Plaintiff was trying to hide certain fraudulent transactions. (*Id.* ¶ 42.) Plaintiff specifically alleges that "one or more of Defendants Clodfelter, Barnhardt, and Merritt drafted and distributed the Anonymous Complaint."[4] (*Id.* ¶ 129.)

The Bank's Audit Committee hired attorney John Babcock of the law firm of Wall, Esleeck, Babcock, LLP, to conduct an investigation into the Anonymous Complaint. (Def. Resp. to Pl. Second Mot. Compel, ¶ 1, docket no. 75.) During the course of the investigation, Babcock reviewed Bank documents and interviewed Bank employees. (Pl. Second Mot. to Compel, ¶ 2, docket no. 73.) Babcock made notes of the interviews and also generated an investigation report.

---

[3] *See* 18 U.S.C. § 1514A et seq. Congress enacted Sarbanes-Oxley in response to numerous accounting scandals at publicly traded companies, the most notably being Enron Corporation. The Act contains, among other things, whistleblower protection provisions for employees who complain about potentially unlawful conduct at a company.

[4] Defendants Clodfelter, Barnhardt, and Merritt have all denied that they drafted the Anonymous Complaint.

On or around September 21, 2009, the OCOB, jointly with the Federal Deposit Insurance Corporation ("FDIC"), initiated a routine examination of the Bank.[5] (OCOB Mot. to Intervene, pp. 1-2, docket no. 72.) On November 13, 2009, the OCOB published its Preliminary Findings of the Report of Examination. (*Id.*) According to Plaintiff's allegations, during the OCOB's 2009 Bank examination, Defendant Robert W. Johnson intentionally published a defamatory *per se* statement about Plaintiff to one or more OCOB examiners. More specifically, Plaintiff alleges that Johnson–verbally and/or in written communications–told one or more OCOB examiners that Plaintiff had presented a loan to the Bank's Board for approval in which Plaintiff had a personal interest, with the intent that the statement then be republished in the Bank's 2009 Final Report of Examination. (Compl. ¶¶ 50, 70-74.) Plaintiff alleges that Johnson's conduct was malicious and done in a bad-faith effort to injure and to damage Plaintiff. (*See id.*)

On December 1, 2009, Plaintiff received a telephone call from an attorney of a different law firm (the Bank's present counsel), informing Plaintiff that he was being suspended pending the conclusion of Babcock's investigation into the Anonymous Complaint. (*See id.* ¶ 38; Pl. Second Mot. to Compel, ¶ 3, docket no. 73.) The suspension was pending an investigation into (1) a paragraph of the Preliminary

---

[5] The OCOB regulates state-chartered banks under Chapter 53 of the North Carolina General Statutes. As part of its regulatory function, and pursuant to N.C. GEN. STAT. § 53-117, the OCOB examines banks doing business under Chapter 53. The FDIC is the federal banking regulator responsible for oversight of Defendant Bank.

Report that was critical of Plaintiff's influence within the Bank and (2) the separate Anonymous Complaint. (*See* Compl. ¶ 38.)

On January 5, 2010, the Bank reinstated Plaintiff's employment and gave him the additional title of Chief Financial Officer. (*Id.* ¶ 41.) On around January 20 and 22, 2010, Babcock submitted written reports of his investigation to the Bank's Audit Committee. (Pl. Second Mot. to Compel, ¶¶ 5, 6, docket no. 73.) On January 22, 2010, the Bank's Audit Committee met with Plaintiff to review the allegations in the Anonymous Complaint. (Compl. ¶ 42.)

The OCOB's Final Report of Examination was issued to the Bank on or about March 29, 2010. (*Id.* ¶ 49.) Plaintiff met with the OCOB on or about April 13, 2010, regarding certain statements in the Final Report referring to Plaintiff. (*Id.* ¶¶ 60-61.) As a result of the meeting, on April 27, 2010, the OCOB issued a letter to the Bank's directors, revising the Final Report by removing various statements about Plaintiff. (*Id.* ¶ 67.) On April 22, 2010, before the revision was issued, the Bank notified Plaintiff that he must either resign or be fired. (*Id.* ¶ 68.) On May 12, 2010, after the revision was received, the Bank fired Plaintiff. (*Id.*)

On May 14, 2010, Plaintiff filed this lawsuit, alleging state law tort claims against Defendant Bank, as well as various individuals, for wrongful conduct that led to his suspension and eventual termination by the bank.[6] As to Defendant Johnson,

---

[6] Jurisdiction in this court is based on diversity of citizenship, as Plaintiff is a Virginia resident, Defendants are all North Carolina residents, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

Plaintiff alleges claims for defamation and tortious interference with contract.[7]  As to the individual Defendants Clodfelter, Barnhardt, and Merritt, Plaintiff alleges claims for tortious interference with contract and conspiracy.[8]  As to Defendants Burnette and Fleming, Plaintiff alleges claims for tortious interference with contract.[9]  As to the Defendant Bank, Plaintiff alleges negligent retention and supervision.  Plaintiff also alleges that Defendant Bank is vicariously liable for the alleged defamation by Defendant Johnson.  Defendant Bank has, in turn, filed several counterclaims against Plaintiff.  All of the summary judgment motions are ripe and now pending before the court.

Before turning to the summary judgment motions, the court first notes that, leading up to the pending motions for summary judgment, the parties were engaged in a discovery dispute involving whether Plaintiff is entitled to discovery of certain documents related to the OCOB examination.  On October 6, 2010, Plaintiff filed a motion to compel Defendants to produce various documents related to the Bank examination and Defendant Johnson's communications with OCOB examiners.  On November 5, 2010, the OCOB filed a motion to intervene, which this court granted.

---

[7]  Plaintiff alleges that Defendant Johnson is the Bank's Chief Lending Officer.

[8]  Plaintiff alleges that Defendant Clodfelter is a former Principal Financial Officer of the Bank; Defendant Barnhardt is a former Assistant Controller of the Bank; and Defendant Merritt was formerly employed by both the FDIC and OCOB, and is currently employed by Credit Risk Management.

[9]  Plaintiff alleges that Defendants Burnette and Fleming are both Bank Directors and serve on the Board's Corporate Governance Committee.

The OCOB argued in its motion to intervene that the documents subject to the first motion to compel, plus additional discovery sought by Plaintiff from various Defendants could not be disclosed pursuant to N.C. GEN. STAT. § 53-99(b), and the deliberative process privilege.

Also on November 5, 2010, Plaintiff filed a second motion to compel production of additional documents requested in discovery. In the second motion to compel, Plaintiff sought production of documents related to attorney Babcock's January 20 and 22 investigative reports and notebooks in his investigation of the Anonymous Complaint alleging Sarbanes-Oxley violations by Plaintiff, as well as the corresponding Audit Committee Board minutes.

On November 17, 2010, the undersigned held a hearing on the motions to compel discovery. At the hearing, the parties agreed to submit various documents to the undersigned for *in camera* review, and the court deferred a ruling on the motions to compel. On April 29, 2011, the undersigned entered an order finding that the documents sought by Plaintiff were not discoverable. (Order, April 29, 2011, docket no. 140.) Thus, the court denied Plaintiff's motions to compel.

### III. Standard of Review on Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming

forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

IV. **Analysis**

A. **Defendant Johnson's Motion for Summary Judgment (docket no. 114)**

The court first addresses a motion for summary judgment by Defendant Johnson as to Plaintiff's claim against Johnson for defamation and tortious interference with contract. Defendant Johnson is a former Examiner with the North

Carolina Office of the Commissioner of Banks. The Bank hired Johnson in June 2009 and soon thereafter assigned him to the position of Chief Lending Officer ("CLO"). Johnson reported directly to the Bank's Chairman, Chief Executive Officer and President, Robert E. Marziano. In his position, Johnson became responsible for the loan documentation and credit administration operations with the Bank, the latter of which had been Plaintiff's general responsibility before Johnson was hired.

According to Plaintiff, although Plaintiff initially supported Johnson, a disagreement arose between the two men when, on around October 21, 2009, Johnson accused Plaintiff of pushing a loan through the Board for approval in which Plaintiff had a personal interest. (Compl. ¶ 26.) Plaintiff further alleges that on around April 12, 2010, in a conversation between the two men, Johnson questioned why Plaintiff had insisted that the Bank cancel a contract with a third-party auditor Credit Risk Management. (Compl. ¶ 59.)

As noted previously, the OCOB's Final Report of Examination, which was received by the Bank on March 29, 2010, contained a statement that Plaintiff may have pushed through a loan in which he had a personal interest. Plaintiff infers that Johnson was the source of this finding. (Compl. ¶¶ 50, 36.) The statements regarding Plaintiff pushing through a loan in which he had a personal interest were removed from the Final Report.

### 1.    Plaintiff's Defamation Claim against Johnson

To recover for defamation, a plaintiff must generally prove that the defendant made false statements of or concerning the plaintiff, which were published to a third person, causing injury to plaintiff's reputation.  *See Hall v. Piedmont Publ'g Co.*, 46 N.C. App. 760, 762, 266 S.E.2d 397, 399 (1980).  The term defamation includes two distinct torts, libel and slander.  *See Phillips v. Winston-Salem/Forsyth County Bd. of Educ.*, 117 N.C. App. 274, 277, 450 S.E.2d 753, 756 (1994).  Generally, libel is written and slander is oral.  *Id.*  Slander *per se* is a form of defamation in which the defendant makes a false oral communication to a third person that (1) harms the plaintiff in his trade, business, or profession; (2) conveys that the plaintiff has a loathsome disease; or (3) states that the plaintiff has committed a crime involving moral turpitude.  *See id.*  Libel *per se* is a publication which, when considered alone without explanatory circumstances: (1) charges that the person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in their trade or profession; or (4) otherwise tends to subject a person to ridicule, contempt, or disgrace.  *Id.*

In support of the defamation claim against Defendant Johnson, Plaintiff contends that Johnson made a statement to OCOB examiners that Plaintiff "presented to the Board a loan" or "pushed through a loan" in which Plaintiff had a personal interest.  (*See* Compl. ¶¶ 51, 70.)  According to the allegations in Plaintiff's

complaint, Johnson published this statement to one or more OCOB examiners, which then led the statement to be republished in the Final Report of Investigation.

Defendant Johnson contends that there is no genuine issue of material fact as to the defamation claim. First, Defendant Johnson contends that Plaintiff has not articulated sufficiently what "statement" was made by Johnson that was purportedly defamatory. For instance, according to Defendant, during this litigation Plaintiff has alluded to two different versions of the alleged defamatory statement. In one version of the statement, Johnson allegedly told OCOB examiners that Plaintiff "pushed through a loan" in which he had a personal interest. (*See* Compl. ¶ 70.) In another version of the statement, Johnson allegedly told OCOB examiners that Plaintiff "presented to the Bank" a loan in which he had a personal interest. (*See id.* ¶ 51.) Thus, Defendant Johnson contends that it is unclear exactly what statement Defendant Johnson is alleged to have made.[10]

In support of his motion for summary judgment, Defendant Johnson denies that he made such statements, but he also suggests in his brief that, if he did make the statements, that the statements were either true, that he had a good-faith reason to believe that they were true, or that the statements were merely opinions over which there was reasonable disagreement. The record evidence shows that there

---

[10] Defendant Johnson also contends that Plaintiff has not alleged whether the statement was written or oral, and, if the statement was written, whether the alleged libel was *per se* (*i.e.*, defamatory on its face), capable of two interpretations, or defamatory *per quod* (*i.e.*, defamatory by context).

were two loan transactions that were purportedly the basis of Johnson's "statement"–a loan referred to as the Twin County Aviation Loan and a loan referred to as the Jeff Johnson Chevrolet loan.[11]  The Twin County Aviation loan concerned two loans to an entity in Hillsville, Virginia, in which Plaintiff was a joint venturer and guarantor.  (Long Dep., pp. 111-12, Def. Johnson's Br. Supp. Mot. Summ. J, Ex. A; Larrowe Dep., pp. 100-04, Ex. B, docket no. 116.)  The Jeff Johnson Chevrolet loan involved a loan in which a former accounting client of Plaintiff asked the Bank to become a significant lender for three loans.  (Long Dep. pp. 123-28, Ex. Y, p. 135, Ex. Z, docket no. 116.)  In his brief, Johnson contends that:

> Certainly there is no basis for concluding that, if Johnson made any version of the Statement, he knew it to be false; at best, the Statement would be an expression of opinion, and . . . Plaintiff "pushed through" both loans, "presented" one, had a Reg-O-violative[12] "personal interest" in [the] Twin County Aviation [loan], and had what two out of three Banking Commission representatives believed to be a "personal interest" in [the] Jeff Johnson Chevrolet [loan].

(Def. Johnson's Br. Supp. Mot. Summ., p. 14, docket no. 115.)  Thus, Johnson suggests that the alleged statement regarding the loans at issue was either true, or it was merely an opinion that was shared by other directors at the Bank.

---

[11]  Defendant Johnson provides more details as to each of the two loans in his brief in support of his motion for summary judgment, but a detailed analysis of each loan is not necessary for the purpose of Johnson's motion for summary judgment.

[12]  "Regulation O" is codified in 12 C.F.R. § 215 and governs extensions of credit by a member bank to, among other persons, executive officers, directors, and principal shareholders of the bank.

It will be recommended that the court grant summary judgment to Defendant Johnson as to Plaintiff's defamation claim. Here, even assuming that Defendant Johnson published anything to a third party, it was to the OCOB examiners. Johnson enjoyed a qualified privilege as to statements made to the OCOB examiners.[13] Thus, Johnson is immune from statements made to the OCOB examiners unless the statements were made in bad faith or with actual malice. *Accord Rockwood Bank v. Gaia*, 170 F.3d 833, 840 (8th Cir. 1999) (stating that, under Missouri law, a bank officer enjoys qualified immunity with regard to a defamation claim as to statements the officer made to bank examiners). Plaintiff has produced no evidence to support his allegations that Defendant Johnson made the purported statement in bad faith and with actual malice to overcome the privilege. Given that Plaintiff *did* have some personal connection to both loans, Johnson may have formed an opinion, however misguided, that the loans were improper, or at least had the appearance of impropriety. The result might be different if Johnson had stated, by contrast, that Plaintiff had personally benefitted from the loans by making an "X amount of money" from the loans, without any evidence whatsoever to support the statement. Here, however, assuming that Johnson made the statement, it was purportedly based on the fact that the Twin County Aviation loan concerned two loans in which Plaintiff was a joint venturer and guarantor, and the

_____

[13] Furthermore, the fact that any statements that Johnson made to the OCOB may have ended up in the Final Report (and then later deleted) does not alter the privilege.

Jeff Johnson Chevrolet loan involved a loan for a former accounting client of Plaintiff. In sum, Plaintiff has simply not shown that the alleged statement was made out of malice.

Finally, Plaintiff's claim for damages resulting from any alleged defamatory statement is dubious. Plaintiff alleges in the complaint that, as a result of the alleged defamatory statement by Johnson, he suffered both actual and presumed damages due to loss of reputation or standing in the community, mental pain and suffering, inconvenience, and loss of enjoyment. The record evidence, however, shows that Plaintiff became employed by Waccamaw Bank in Whiteville, NC, as Executive Vice President and Chief Administrative Officer on November 1, 2010, at a stated annual salary of $210,000. (*See* Def. Johnson's Motion, Ex. TT; Dep. of James C. Graham ("Graham Depo.") pp. 14-15, Motion Ex. UU; Larrowe Dep., p. 47, Motion Ex. XX, docket no. 116.) Before assuming that position, Plaintiff served as a consultant for at least two financial institutions, including Waccamaw Bank. Plaintiff's aggregate income from these entities over the period from May 2010 to November 2010 was $125,203.75.[14] (Motion Ex. YY; Graham Dep., pp. 13-14, Motion Ex. UU, *supra*) (Plaintiff's consulting services to Waccamaw began in early June 2010).

Graham, Waccamaw's CEO, was the individual who decided to retain Plaintiff as a consultant and to hire him as an employee. Graham testified that Plaintiff has

_____

[14] Defendant notes that, according to an 8-K filing by Waccamaw Bank, Plaintiff has now resigned his position with Waccamaw, effective April, 1, 2011. (Motion Ex. VV.)

"a very strong reputation" and is "a very capable individual, a very knowledgeable individual." Although mentioning that others who had heard something about the dispute between Plaintiff and Bank of the Carolinas had questioned the decision to employ Plaintiff, Graham stated that Plaintiff's reputation was unimpeachable, insisting that Plaintiff is "one of the most honest people I've ever dealt with," with "impeccable integrity." (Graham Dep. 33-34, Motion Ex. AAA, docket no. 116.). Here, Plaintiff has not presented evidence that he was damaged by the alleged defamatory statement. In sum, for the reasons stated herein, the court should grant summary judgment to Defendant Johnson as to Plaintiff's defamation claim.

## 2. Plaintiff's Tortious Interference Claim against Johnson

Next, the court should likewise grant summary judgment to Defendant Johnson as to Plaintiff's claim for tortious interference with contract. To prove tortious interference with contract under North Carolina law, a plaintiff must meet the following five elements: (1) a valid contract between the plaintiff and a third person; (2) the defendant knows the contract exists; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). "In order to demonstrate the element of acting without justification, the action must indicate 'no motive for interference other than malice.'" *Area Landscaping, L.L.C. v. Glaxo-*

*Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) (internal citation omitted).

North Carolina law often grants immunity from liability for tortious interference with contractual rights to non-outsiders who are employed by or affiliated with a party to the contract. *See, e.g., Lenzer v. Flaherty*, 106 N.C. App. 496, 513, 418 S.E.2d 276, 286 (1992). The non-outsider privilege is lost if used for improper reasons. *See Wilson v. McClenny*, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964); *Sides v. Duke Univ.*, 74 N.C. App. 331, 347, 328 S.E.2d 818, 829 (1985). As a "non-outsider" to the Bank's employment contract with Plaintiff, Johnson enjoyed a qualified privilege to interfere with the contract as long as he used proper means and was acting in good faith to protect the Bank's interest.

Plaintiff has simply not shown how Johnson interfered with Plaintiff's contract for employment with the Bank. The Bank itself has asserted that Plaintiff was not fired for any involvement with loans in which Plaintiff allegedly had a personal interest. More specifically, the Bank's CEO Robert Marziano testified in his deposition that he made the decision to fire Plaintiff, and that he fired him because of the Bank's poor performance and the need for a change in management. (Marziano Dep. 41; 113-15; 250-52; 270-71.) Furthermore, Plaintiff has not produced evidence showing that Johnson's statements to the OCOB examiners were made in bad faith. In sum, summary judgment should be granted as to Plaintiff's claim against Johnson for tortious interference with contract.

**B.    Defendant Merritt's Motion for Summary Judgment (docket no. 117)**

As noted, Plaintiff has alleged that Defendants Barnhardt, Clodfelter, and Merritt all conspired to submit the Anonymous Complaint in October 2009 alleging Sarbanes-Oxley violations by Plaintiff.  Plaintiff brings claims against these three defendants for tortious interference with contract, as well as a claim for "conspiracy." The case has settled as to Defendants Barnhardt and Clodfelter.  In his motion for summary judgment, Merritt contends that there is no genuine issue of fact as to whether he committed tortious interference with contract or conspiracy, and he is entitled to summary judgment as a matter of law as to both of these claims.  The court agrees.

Plaintiff has produced no evidence that Merritt took any action that induced the Bank to fire Plaintiff.  Plaintiff's primary ground for his claim against Merritt for tortious interference with contract is Plaintiff's contention that Merritt conspired with Defendants Barnhardt and Clodfelter to submit the Anonymous Complaint alleging that Plaintiff had committed Sarbanes-Oxley violations.  Plaintiff has produced no evidence that Merritt was involved in sending the Anonymous Complaint. Furthermore, Plaintiff was cleared of any wrongdoing as alleged against him in the Anonymous Complaint.

Finally, even assuming that Defendant Merritt tried to interfere with Plaintiff's contract, Plaintiff must still show that the acts caused Plaintiff's firing.  As noted,

*supra,* CEO Robert Marziano testified in his deposition that he made the decision to fire Plaintiff, and that he fired him because of the Bank's poor performance and the need for a change in management.  Marziano further testified that his decision had nothing whatsoever to do with either the Anonymous Complaint, which he never believed, or with Merritt.  (Marziano Dep. 41; 113-15; 250-52; 270-71.)  Furthermore, Defendant Merritt has introduced evidence showing that to the extent that board members influenced or directed that decision, they supported the decision and testified that it had nothing whatsoever to do with the Anonymous Complaint, or with Merritt.  (Fleming Dep. 120, 140; Burnette Dep. 116-18; Land Dep. 81-82.)  Finally, in a Rule 30(b)(6) deposition, the Bank's representative testified that neither the Anonymous Complaint nor Merritt had anything to do with Plaintiff's firing.  (Bank (Robertson) Dep. 158.)

In sum, Defendant Merritt is entitled to summary judgment as to Plaintiff's claim against him for tortious interference with contract.  As a result, Merritt is likewise entitled to summary judgment as to Plaintiff's "conspiracy" claim against him.

### C. Motion for Summary Judgment by Defendants Burnette and Fleming (docket no. 111)

At all relevant times, Defendants Burnette and Fleming were members of the Defendant Bank's Board of Directors, and constituted a minority among the seven members of the Board on the Corporate Governance Committee.  Both Burnette and

Fleming had been founding Directors of the Bank, along with Plaintiff; thus, the three men had served on the Board together for almost ten years when Plaintiff became an employee.

Plaintiff brings a claim for tortious interference with contract against Defendants Burnette and Fleming. Because Burnette and Fleming were "non-outsiders" to the Bank's contract with Plaintiff, they enjoyed a qualified privilege to interfere with the contract, as long as they used proper means and if they were acting in good faith to protect the Bank's interest.

### 1. Plaintiff's Evidence as to the Tortious Interference Claim against Defendant Burnette

On September 21, 2009, Burnette sent an email to the entire Board that was critical of Plaintiff. Among other things, Burnette stated in the email that "since you [Larrowe] came on board there has been nothing good to happen. Your positions have always been lengthy, obscure and non understandable." Burnette also wrote that he knew that he had no authority to fire Plaintiff, that "this email is only my opinion," and "for the sake of the long term future of our bank . . . would you please get out of the way." (Ex. G to Pl.'s Mem. Opp. Mot. Summ. J., Dep. Ex. 80, docket no. 149.)

The next morning, John Drye, Chairman of the Governance Board, responded to Burnette's email, stating:

> I take exception with your characterization of [Larrowe]. [Larrowe] has had nothing but the best interest [of] the bank in mind when doing his

> job. Our board has witnessed your previous [sic] attempts to manipulate by writing emails/letters, talking out of the board room and making threats to get your way. Bill you are simply out of line and out of order. Your attacks on [Larrowe] border on libel, and I for one do not agree with any of the points you made. Bill with your continued unprofessional behavior, I think you should consider resigning from our board.

(*Id.*) That afternoon, Burnette responded to Drye's email by stating that during the next few days he would "craft a response that will give you some insight into my strong feelings on this matter." (*Id.*) Burnette never sent a follow-up email. (*Id.*)

In addition to the email of September 21, 2009, in support of his tortious interference with contract claim, Plaintiff further points to Burnette's participation in an April 14, 2010, Corporate Governance Committee meeting, in which several other committee members–including Drye–also voiced their negative views about Plaintiff. (Larrowe Dep. 95-97.) Plaintiff furthermore concludes that because Burnette was a bank director he *must* have influenced the Bank's decision to fire Plaintiff.

Burnette is entitled to summary judgment as to Plaintiff's claim for tortious interference with contract. Aside from the e-mail from Burnette and Burnette's participation in the April 14, 2010, Corporate Governance Committee meeting, Plaintiff has produced no evidence to support his claim that Burnette intentionally induced the Bank to fire Plaintiff. Furthermore, even if the court assumes that Burnette supported the non-renewal of Plaintiff's contract with the Bank, Plaintiff has not presented any evidence showing that Burnette's acts were borne out of malice. As an insider to the contract and as a Bank director, Burnette enjoyed a qualified

privilege to intentionally cause the Bank to not renew Plaintiff's contract as long as he did not use improper means and if he acted in good faith to protect the Bank's interests. Here, even if Burnette supported the ousting of Plaintiff from the Bank, Plaintiff has failed to show that Burnette used any improper means, or that he was acting with anything other than a good faith belief that he was acting in the Bank's best interest. In sum, the court should grant summary judgment to Defendant Burnette as to Plaintiff's claim for tortious interference with contract.

### 2. Plaintiff's Evidence as to the Tortious Interference Claim against Defendant Fleming

Plaintiff's evidence as to Fleming's tortious interference with contract claim is scant. It is undisputed that Defendant Fleming approached Plaintiff in October 2009 and asked him to resign from the Board Loan Committee because Plaintiff's presence in committee meetings was making Defendant Johnson "uncomfortable." (Larrowe Response to Fleming Interrogatory No. 2, Ex. I to Pl.'s Mem. Opp. Mot. Summ. J., docket no. 149.) Plaintiff declined Fleming's request. Plaintiff has not alleged that Fleming had been critical of Plaintiff, with the exception of opinions that Fleming expressed during Board and Committee meetings. Plaintiff has not introduced any evidence during discovery to show that Fleming acted inappropriately by voicing his opinion in the meetings, or by attempting to exert influence over the Bank. Furthermore, like Burnette, Fleming enjoyed a qualified privilege to interfere

with the Bank's contract with Plaintiff as long as he did not use improper means and if he acted in good faith to protect the Bank's interests.

Finally, as to both Burnette and Fleming, the Bank's CEO Marziano testified that he *alone* made the decision to place Plaintiff on a leave of absence, and the Bank has repeatedly stated that no individual interfered with Plaintiff's contract with the Bank. In sum, for the reasons stated herein, summary judgment should be granted to Defendants Burnette and Fleming as to Plaintiff's claim for tortious interference with contract.[15]

### D. Defendant Bank of the Carolinas' Motion for Summary Judgment as to Plaintiff's Claims against the Bank (docket no. 108)

Plaintiff has filed claims against Defendant bank for negligent retention and supervision based on the Bank's retention of fellow officers Defendants Fleming and Burnette. Plaintiff also seeks to impose vicarious liability against the Bank for the alleged defamatory statements by Defendant Johnson. For the following reasons, the court finds that the Bank is entitled to summary judgment as to each of these claims.

A claim for negligent retention/supervision contains the following:

(1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either

---

[15] Defendants Burnette and Fleming also contend that Plaintiff has not shown that he sustained damages as a result of Fleming's or Burnette's alleged tortious interference with contract because Plaintiff obtained a lucrative position after leaving the Bank.

actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' . . . ; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (emphasis omitted; alteration in original).

As to the negligent retention and supervision claim, there is no such legal or factual basis for a negligence retention and supervision claim against the Bank based on Fleming's and Burnette's conduct. As a matter of law, Plaintiff simply cannot bring such a claim based on the fact that Burnette expressed strong personal views in an email, a fellow director rebuked Burnette for his comments, and Burnette was cautioned to refrain from writing similar communications in the future.

Next, as to Fleming, there is even less of a foundation for a negligent retention/negligent supervision claim. That is, Plaintiff alleges that Fleming asked Plaintiff not to attend Board Loan Committee Meetings, and Plaintiff refused. Again, these allegations simply cannot, as a matter of law, support a claim for negligent retention/supervision by the Bank. In sum, the Bank is entitled to summary judgment as to Plaintiff's claim against the Bank for negligent retention and supervision based on Burnette's and Fleming's conduct.

Next, as to the claim against the Bank for vicarious liability based on an alleged defamatory statement by Defendant Johnson to establish an employer's liability for the defamatory comments of an employee, a plaintiff must prove at least

one of the following: (1) the company expressly authorized the comments; (2) the comments were made in the scope of employment; or (3) the company ratified the comments. *EEOC v. Matthews*, No. 2:92CV610, 1995 WL 529197, at *4 (M.D.N.C. June 26, 1995). Furthermore, to show "that the wrongful act of an employee has been ratified by his employer, it must be shown that the employer had knowledge of all material facts and circumstances relative to the wrongful act, and that the employer, by words or conduct, shows an intention to ratify the act." *Id. at *5* (quoting *Brown v. Burlington Indus., Inc.*, 93 N.C. App. 431, 437, 378 S.E.2d 232, 236 (1986)).

The court has already found that Defendant Johnson is entitled to summary judgment as to Plaintiff's claim against him for defamation. That is, Plaintiff has failed to present evidence on summary judgment sufficient to raise a genuine issue of fact as to whether Johnson defamed Plaintiff. For this reason alone, Plaintiff's vicarious liability claim against Defendant Bank fails.[16] In sum, for the reasons stated herein, the Bank is entitled to summary judgment as to the claims against it for negligent retention and supervision based on the Bank's retention of Defendants Fleming and Burnette, as well as the claim for vicarious liability based on the alleged defamatory statements by Defendant Johnson.

---

[16] Even assuming that Plaintiff could show that Defendant made a defamatory statement, the Bank would still not be vicariously liable because Defendant Bank has produced evidence that it did not authorize and would not have ratified any such statement by Johnson.

**E.**    **The Parties' Respective Motions for Summary Judgment as to the Bank's Amended Counterclaims against Plaintiff (docket nos. 119, 130)**

Next, I address the Bank's summary judgment motion as to the Bank's amended counterclaims against Plaintiff, as well as Plaintiff's own summary judgment motion.  The Bank's Amended Counterclaim alleges the following, seven claims for relief:  breach of fiduciary duty (Count I), tortious interference with contract (Count II), tortious interference with regulatory relationships (Count III), tortious interference with prospective advantage (Count IV), breach of confidentiality (Count V), unfair and deceptive trade practices (Count VI), and a request for additional relief (Count VII).  The Bank has withdrawn Counts III and VI, as well as paragraph 8(c) of Count I, by motion for voluntary dismissal, and the court has dismissed these claims.  (Order, June 21, 2011, docket no. 165.)

Furthermore, in its brief supporting its motion for summary judgment on the amended counterclaim, the Bank has acknowledged that it will be unable to recover on its tortious interference with prospective business advantage claim (Count IV). (Def. Bank's Br. Supp. Mot. Summ. J. on Am. Counterclaim, p. 14-15 n.15.) Therefore, the Bank has abandoned that claim.  Thus, the following amended counterclaims remain: breach of fiduciary duty (Count I), except for paragraph 8(c),[17]

---

[17]    Defendant Bank alleges in Paragraph 8(c) of Count I of its Amended Counterclaims that "Plaintiff engineered retroactive pay increases for former employees of Plaintiff for whom he secured employment with the Bank, without the knowledge of any other individual that those increases were being made retroactive for nearly 16 months." (First Amended Answer and Counterclaims, docket no. 77.)

tortious interference with contract (Count II), and breach of confidentiality (Count V). Both parties have filed motions for summary judgment as to these remaining amended counterclaims.

The court first notes that, in its brief in support of its own motion for summary judgment, Defendant Bank does not even attempt to comply with Rule 56 of the Federal Rules of Civil Procedure, or this court's Local Rule 56.1(d). Under Local Rule 56.1(d), when a party such as Defendant Bank seeks summary judgment, it must "set out the elements that it must prove (with citations to supporting authority), and the specific, authenticated facts existing in the record or set forth in accompanying affidavits that would be sufficient to support a jury finding of the existence of those elements." L.R. 56.1(d). Rather than setting forth legal principles and applying the applicable legal principles to the facts, Defendant Bank merely presents for the court a detailed narrative, almost entirely devoid of record cites, of a litany of alleged improper conduct that Plaintiff engaged in while employed with the Bank. The Bank does not articulate which material facts, if any, are in dispute, nor does the Bank set forth the elements of the counterclaims that it brings against Plaintiff. Based on Defendant Bank's wholesale abandonment of Local Rule 56's requirements, Defendant Bank's motion for summary judgment as to its amended counterclaims could be denied on this basis alone.

### 1.    Breach of Fiduciary Duty (Count I)

In Count I of its Amended Counterclaims, the Bank primarily seeks to impose fiduciary liability on Plaintiff for various bank decisions made during Plaintiff's tenure. The North Carolina Supreme Court has described the necessary elements for a claim of breach of fiduciary duty as follows:

> For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . ., [and] 'it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'"

*Harris v. Matthews*, 361 N.C. 265, 284, 643 S.E.2d 566, 577-78 (2007) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (ellipses and brackets in original) (citations omitted) (emphasis added)).  In addition, to maintain a cause of action for breach of fiduciary duty, "an essential element [is] that a plaintiff incur actual damage."  *Dove v. Harvey*, 168 N.C. App. 687, 691, 608 S.E.2d 798, 801 (2005).

North Carolina has also codified the "business judgment rule," which immunizes officers' and directors' decisions made: (1) in good faith; (2) with reasonable care; and (3) in a manner reasonably believed to be in the interests of the corporation.  *See* N.C. Gen. Stat. § 55-8-42(a) (officers); N.C. Gen. Stat. § 55-8-30(a) (directors); *see also Wachovia Capital Partners, LLC v. Frank Harvey Inv.*

*Family, L.P.*, No. 05cvs20568, 2007 WL 2570838, at *4 (N.C. Super. Ct. Mar. 5, 2007) ("The business judgment rule recognizes that business decisions are best left in the hands of informed and experienced boards of directors and managers. Courts, while expert at interpreting and applying the law, 'are ill equipped to engage in post hoc substantive review of business decisions.'") (quoting *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746 (Del. Ch. 2005)).

Here, the only action that the Bank describes in particularity and for which the Bank contends that it suffered a specified amount of damages as a result of Plaintiff's alleged breach of fiduciary duty involves a contract between the Bank and a third party for the absolute auction of three Bank properties. On or about May 15, 2009, the Bank entered into separate contracts with Kyle Realty, Inc. ("Kyle Realty") for the absolute auction of the three properties. Plaintiff and Marziano negotiated the contracts on behalf of the Bank, signed by Plaintiff, and vetted by the appropriate Bank board(s). Thomas H. Kyle signed the contracts on behalf of Kyle Realty. Plaintiff's brother-in-law, Sam Patton, is employed by Kyle Realty.

The three auctions were staggered to occur on or before July 9, 10, and 11, 2009. Kyle Realty engaged in significant marketing and advertising efforts in preparing for the auctions. Under the contracts, Kyle Realty expected that the Auctions would result in a six-percent commission on the contract price of each property, and a two-percent buyer's premium of the bid price to be included in the

contract price. Alternatively, if the properties were sold before the day of the auctions, Kyle Realty would have earned an eight percent commission.

On July 6, 2009, the Bank notified Kyle Realty that it was canceling the auctions. Kyle Realty believed that the Bank had breached the three contracts, as there was no provision in the contracts allowing the Bank to cancel. Kyle Realty informed the Bank that it would pursue its legal rights. The Bank asked Kyle Realty for a proposal to settle the dispute. Kyle Realty proposed that the Bank pay approximately half of its expected commission on the sale of the three properties, as well as its expenses incurred. Marziano and Plaintiff conducted settlement negotiations on behalf of the Bank.

The dispute was resolved pursuant to the terms of a Listings Termination Agreement. The Listings Termination Agreement was drafted by the Bank and/or its attorneys. Mr. Kyle signed the Listings Termination Agreement on behalf of Kyle Realty on or around its effective date, and it was executed by Marziano on behalf of the Bank. The Bank paid Kyle Realty a total of $79,307 to settle claims resulting from the three contracts.

In the amended answer and counterclaims, Defendant Bank alleged that Plaintiff breached his fiduciary duty to the Bank as to the Kyle Realty contract. (Amended Answer and Counterclaims, ¶ 8(a) & (b), docket no. 77.) Defendant Bank alleges that Plaintiff initiated the purported contractual relationships between the Bank and Kyle Realty and that Plaintiff only drafted the contracts for the auctions

after the contracts were cancelled.  Defendant Bank alleges that the commissions were wholly unwarranted and that Plaintiff initiated the contractual relationships for "purely personal reasons."  (*Id.* ¶ 8(a).)  The Bank claims $72,120 of this amount as damages as an unwarranted commission resulting from the termination of the Kyle Realty contracts.  In response, Plaintiff contends that, under the terms of the Listings Termination Agreement, the $72,120 amount was not a commission but was part of a settlement of Kyle Realty's potential claims under the Listings Agreement.

The court should grant summary judgment to Plaintiff and deny Defendant Bank's summary judgment motion as to Defendant Bank's amended counterclaim for breach of fiduciary duty.  Here, the court agrees with Plaintiff's contention in his own brief opposing the Bank's motion for summary judgment that:

> At bottom, the Bank's alleged breaches of fiduciary duties [by Plaintiff] consist of its own vetted decisions, and/or decisions that Larrowe made or participated in as an executive.  The Bank seeks to impose liability for these internal business decisions that it now purports to regret in hindsight.  Such claims cannot be maintained against Larrowe, either because he was not the ultimate decision-maker, and/or due to the aforementioned business judgment rule.

(Pl.'s Br. Opp. Def. Bank's Mot. Summ. J. on Am. Counterclaims, p. 17.)

Specifically, with respect to the Bank's contention that Plaintiff breached a fiduciary duty to the Bank by participating in the Kyle Realty auctions, Defendant Bank has produced no evidence to show that Plaintiff initiated the contracts for purely personal reasons, or that he created the contracts only after the auctions were cancelled so that his brother-in-law would benefit financially.  Furthermore,

Plaintiff has shown that the Bank's CEO Marziano was primarily involved with the auctions, including signing the Listings Termination Agreement.

In sum, the court should grant summary judgment to Plaintiff and deny summary judgment to Defendant Bank as to the claim for breach of fiduciary duty.

### 2.    Tortious Interference with Contract (Count II)

Defendant Bank's claim for tortious interference with contract is based on Plaintiff's involvement in the cancellation of a contract between the Bank and Credit Risk Management ("CRM").   In February 2010, the Bank contracted for CRM to perform a credit review of the Bank.  CRM began its work on around April 12, 2010, but was asked to leave the Bank after only a day or two.  Defendant Bank contends that, as a result of the termination of the contract with CRM, the Bank suffered damages of $19,596.57 for the amount of fees paid to CRM.   Defendant Bank suggests in its brief that Plaintiff's interference with the contract was unjustified because Plaintiff was merely trying to prevent CRM from closely examining certain loans at the Bank that Plaintiff had been involved with.

In response, Plaintiff denies that he supported terminating the CRM contract because he wanted to avoid scrutiny of loans he had been involved with.  Rather, according to Plaintiff, he did not want CRM to conduct the review because Defendant Merritt was working at CRM at the time.  Before his employment with CRM, Merritt worked at the FDIC.  Shortly before CRM came to the Bank in April 2010, Plaintiff learned that Merritt was employed with CRM.  The Bank's CEO

Marziano also learned that Merritt was working with CRM only about a week before CRM came to the Bank.

Plaintiff raised concerns to Marziano about Merritt having access to the Bank through the CRM engagement. According to Plaintiff, he was concerned about Merritt having access to the Bank's records because he believed that Merritt had inappropriately involved himself in the Bank's business and activities. With Marziano's permission, Plaintiff then spoke to Henry Land about the situation. Land had acted as the Bank's Audit Committee Chair and participated in the Bank's investigation into the Anonymous Complaint. Land directed Marziano to cancel the CRM engagement if CRM would not agree to end Merritt's employment. Instead of proposing that CRM fire Merritt, Marziano canceled CRM's engagement.

After CRM left the Bank in April 2010, it did perform an outside credit review for the Bank. (Land Dep. at 75-76.) As a condition to this engagement, the Bank obtained a written guarantee from CRM's owner Ruffin that Merritt would be completely "walled off" from the Bank's information, and that CRM would maintain a dedicated, acceptable server to house the Bank's files. (Land Dep. at 75-76, 173-74, 182-83.)

According to Plaintiff, because of Land's involvement with the Bank's investigation into the Anonymous Complaint, Land had come to his "own conclusion

that Tim Merritt was not a person that the Bank of the Carolinas wanted in their offices, in their files, communicating with their employees."[18]  (Land Dep. at 71.)

Land understood that, although Merritt was not working on the Bank's review, "he works for the company that's doing this job," and could "very easily have access to" the Bank's files and personnel.  (Land Dep. at 73-74.)  Land was "very very very concerned about damage to the [B]ank" at the time CRM was "on the scene in April." (Land Dep. at 173.)  Plaintiff notes that, in fact, Land stated that he did not want Merritt "within 100 miles of the Bank."  (Fleming Dep. at 136.)

Furthermore, Marziano testified that he believed that CRM should have remained in April 2010, as long as CRM's owner would promise that Merritt would have no involvement with the Bank's credit review.  (Marziano Dep. at 155-56, 189, 235-36.)  While Marziano disagreed with Land's decision to cancel the CRM contract, he nevertheless believes that Plaintiff "had a sincere concern about a company that Tim Merritt works for doing work for the Bank."  (*Id.* at 189; *see also* Ex. N. Burnette Dep. at 82-82 ("[Plaintiff] always does what he thinks is in the best interests of the [B]ank.").)  Plaintiff notes, furthermore, that Marziano explicitly disavowed any notion that Plaintiff was motivated by any concerns over loans with which Plaintiff had been involved.  (Marziano Dep. at 155-56, 189.)  Likewise,

---

[18]  Defendant Bank admitted in its Rule 30(b)(6) deposition that Merritt had inappropriately involved himself in the Bank's business and activities, and that it would be "inappropriate for Mr. Merritt to have any role with the business or activities of the Bank" as an employee of CRM.  (Bank 30(b)(6) Dep. (Robertson) at 30-31.)

Johnson "accepted" Plaintiff's stated reasons as "the truth" and opined that it "would not be acceptable" for Merritt to have any involvement with the Bank. (Ex. O., Johnson Dep. at 53, 244-49.)

The court finds that Plaintiff is entitled to summary judgment as to the Bank's tortious interference with contract counterclaim. Plaintiff has introduced evidence showing that his desire not to have CRM perform the review was justified in that he was concerned about Merritt having access to the Bank's files. Furthermore, other directors with the Bank shared Plaintiff's concerns. In response to Plaintiff's evidence regarding his involvement in terminating the CRM contract, Defendant Bank has simply not raised a genuine issue of fact as to whether Plaintiff's interference with the contract was justified.

In sum, for the reasons stated herein, the court should grant Plaintiff's motion for summary judgment as to Defendant Bank's amended counterclaim for tortious interference with contract.

### 3. Breach of Confidentiality (Count V)

Next, as to Defendant Bank's amended counterclaim for breach of confidentiality, the court should grant Plaintiff's motion for summary judgment. First, as Plaintiff notes, there is no general claim for "breach of confidentiality" under North Carolina law. Furthermore, Defendant Bank fails in its motion to identify any particular legal duty that Plaintiff has breached, and the Bank cites no facts to

support any claim for breach; rather, the Bank merely references certain allegations in Plaintiff's complaint, with no citation.

Finally, Defendant Bank has conceded that, with regard to this claim, it cannot identify with particularity damages that it has incurred as a result of the alleged breach of Plaintiff's duty of confidentiality.[19] In sum, the court should grant Plaintiff's motion for summary judgment as to Defendant's amended counterclaim against Plaintiff for breach of confidentiality.

## V.   Conclusion

For the reasons stated herein, it is **RECOMMENDED** that the court **GRANT** the following motions: the motion for summary judgment by Defendant Bank of the Carolinas (docket no. 108); the motion for summary judgment by Defendants William A. Burnette and Thomas G. Fleming (docket no. 111); the motion for summary judgment by Defendant Robert W. Johnson (docket no. 114); the motion for summary judgment by Defendant James Timothy Merritt (docket no. 117); and the motion for summary judgment by Plaintiff Michael Larrowe as to Defendant Bank of the Carolinas' amended counterclaims (docket no. 119).

---

[19]   Defendant Bank suggests in its brief that the "damages" incurred are the attorney's fees spent in defending against Plaintiff's claims. Such an argument flies in the face of the well-known American rule that each party must bear its own attorney's fees and costs, absent explicit Congressional authorization to the contrary. *See Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y*, 421 U.S. 240, 247 (1975).

Furthermore, it is **RECOMMENDED** that the court **DENY** the following motion: the motion for summary judgment by Defendant Bank of the Carolinas on its amended counterclaims against Plaintiff Michael Larrowe (docket no. 130).[20]

_____
WALLACE W. DIXON
United States Magistrate Judge

August 24, 2011

_____

[20] If the court adopts the Recommendation of the undersigned, the result will be that all of Plaintiff's claims against all Defendants will be dismissed and all of Defendant Bank's amended counterclaims against Plaintiff will be dismissed, leaving no remaining claims by either party.